GREGORY A. KASPER
kasperg@sec.gov
TERRY MILLER (*pro hac vice* application forthcoming)
millerte@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>                              **Plaintiff,**<br><br>v.<br><br>**LAWRENCE BILLIMEK, and ALAN WILLIAMS,**<br><br>                              **Defendants.** | **22-cv-10542**<br><br>**ECF CASE**<br>**JURY TRIAL DEMANDED**<br><br><br>**COMPLAINT** |

Plaintiff United States Securities and Exchange Commission (the "SEC"), for its Complaint against Defendants Lawrence Billimek and Alan Williams, alleges as follows:

### SUMMARY

1.     This case involves an insider trading and front-running scheme by Defendants Billimek and Williams. For over six years, Williams unlawfully traded hundreds of securities based on material nonpublic information that Billimek unlawfully disclosed to him. The scheme resulted in proceeds of over $47 million.

2.     Billimek is a trader at a major United States-based asset management firm ("Asset Manager") that routinely bought and sold securities in such large amounts that the trades caused the price of those securities to increase or decrease in a predictable way. Billimek advised

Williams of these market-moving trades prior to their execution and Williams traded to take advantage of the expected price change.

3.      Between September 2016 and August 15, 2022, Williams used two brokerage accounts ("Williams Accounts") to trade in the same securities, on the same day, as the Asset Manager, trading prior to the Asset Manager or while multiple large orders were being placed by the Asset Manager. The Williams Accounts' positions were closed after the Asset Manager traded a large quantity of stock and the price of the security moved as expected. This scheme generated millions of dollars of illegal profits. Williams transferred at least $540,000 to a bank account owned by Billimek during this time period.

4.      As detailed below, the scheme involved timely communications from Billimek to Williams, followed by Williams opening positions in the same securities as the Asset Manager, and then Williams closing out his positions in the securities traded by the Asset Manager.

5.      In violation of his duty to the Asset Manager, Billimek provided Williams with information about the impending trades by his employer that he knew, consciously avoided knowing, or was reckless in not knowing was material nonpublic information and that Williams intended to trade on it. Williams knew, consciously avoided knowing, or was reckless in not knowing that the information that Billimek provided to him was material nonpublic information and that Billimek was providing the information in breach of a duty.

## SUMMARY OF VIOLATIONS

6.      By virtue of the foregoing conduct and as alleged further herein, Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]. Billimek also violated Section 17(j) of the

Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C § 80a-17(j)] and Rules

17j-1(b)(1) and (3) thereunder [17 C.F.R. § 270.17j-1(b)(1) and (3)]. Unless restrained and

enjoined, Defendants will continue to violate the federal securities laws.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7.     The SEC brings this action pursuant to authority conferred upon it by Exchange

Act Section 21(d) [15 U.S.C. § 78u(d)], Securities Act Sections 20(b) and (d) [15 U.S.C. § 77t(b)

and (d)], and Investment Company Act Section 44 [15 U.S.C. § 80a-43].

8.     The SEC seeks a final judgment: (a) permanently enjoining Defendants from

violating the federal securities laws and rules this Complaint alleges they have violated;

(b) ordering Defendants to disgorge any ill-gotten gains they received with prejudgment interest

thereon; (c) ordering Defendants to pay civil money penalties pursuant to Exchange Act Section

21A [15 U.S.C. § 78u-1] or 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Securities Act Section 20(d)

[15 U.S.C. § 77t(d)] and Investment Company Act Section 49 [15 U.S.C § 80a-48]; and (d)

ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to and Exchange Act

Sections 21(d) and 27 [15 U.S.C. §§ 78u(d) and 78aa], Securities Act Sections 20(b), 20(d) and

22 [15 U.S.C. §§ 77t(b), 77t(d), and 77v], and Investment Company Act Section 44 [15 U.S.C.

§ 80a-43].

10.    Venue is proper in this district pursuant to Exchange Act Section 27(a) [15 U.S.C.

§ 78aa(a)], Securities Act Section 22(a) [15 U.S.C. § 77v(a)], and Investment Company Act

Section 44 [15 U.S.C. § 80a-43]. Certain of the acts, practices, transactions, and courses of

business alleged in this Complaint occurred within this district. Certain of the securities involved

in this scheme are traded on exchanges located within this district. In addition, the Asset

Manager has its headquarters in this district.

## DEFENDANTS

11.    **Williams**, age 77, is a United States citizen and a resident of West Linn, Oregon.

Williams began working in the securities industry in 1971 and previously worked for a number

of financial industry businesses as a trader and/or registered representative. He also obtained

Series 1, 7, and 55 securities licenses.

12.    **Billimek**, age 51, is a United States citizen and has residences in a number of

locations, including Hailey, Idaho, Bend, Oregon, and Hanalei, Hawaii. Billimek is an equity

trader for the Asset Manager who places trades on behalf of the Asset Manager's client accounts

and as such he is associated with a registered investment adviser. He was formerly employed by

a number of financial industry firms.

## RELEVANT ENTITY

13.    **Asset Manager** is headquartered in New York, New York and is a registered

investment adviser. It provides investment management services to eight advisory client funds

("Funds"), each one of which is an investment company, and places trades in the Funds'

brokerage accounts ("Fund Accounts"). It manages approximately $283 billion in discretionary

client assets.

## FACTUAL ALLEGATIONS

### I.    Billimek Had Access to the Asset Manager's Material Nonpublic Information.

14.    The Asset Manager provides portfolio management services to eight Funds and

each Fund has one or more Fund Accounts. Fund Accounts invest in securities using a variety of

investment strategies. Because of the size of the Funds' portfolios, trades intended to achieve the

goals of their investment strategies can be very large and some of those trades impact the price of the stocks that the Asset Manager is buying or selling for the Funds.

15.    Billimek has been an equity trader at the Asset Manager since 2012. As an equity trader, Billimek's job responsibilities include routing orders based on trading decisions made by the Asset Manager's portfolio managers on behalf of the Funds to broker-dealers for trade execution. As part of this work, he has access to information about the Asset Manager's planned trades for the Funds.

16.    Information about the upcoming trades of the Asset Manager was material nonpublic information because the Asset Manager managed portfolios worth billions of dollars, and its trades were often of a significant volume that the trades impacted the price and supply or demand of the security being traded.

## II.    Billimek Was Obliged to Keep Material Nonpublic Information Confidential.

17.    Upon information and belief, throughout the relevant period, Billimek was an "Access Person" of the Asset Manager under its code of ethics. The term "Access Person" includes people who have access to nonpublic information regarding the purchase or sale of securities by funds for which the Asset Manager serves as an investment adviser.

18.    The Asset Manager's code of ethics prohibited Access Persons, such as Billimek, from engaging in front-running or misusing material nonpublic information.

19.    For example, in relevant part, the Asset Manager's code of ethics from August 2016 stated the following regarding front-running: "*Access Persons are prohibited from 'front running' (*e.g.*, purchasing or selling securities for personal, Fund, or Client Account while having knowledge of a Fund's or Client Account's trading positions or plans)*." The Asset Manager's code of ethics also prohibited Access Persons from "*disclosing material, nonpublic*

*information regarding … transactions of any Funds or Client Accounts … to any person outside of [the Asset Manager].*"

20.    Throughout the relevant period, as an employee of the Asset Manager and in his role as an equity trader, Billimek was subject to the Asset Manager's code of ethics.

21.    At all relevant times, Billimek owed a duty of trust and confidence to his employer, the Asset Manager, to maintain the confidentiality of the Asset Manager's material nonpublic information and to refrain from disclosing such information to others outside of the Asset Manager.

### III.    **The Trading Scheme**

22.    "Front-running" in the securities markets involves trading ahead of large, non-public orders of market participants to benefit from the market impact of those large orders. Large orders can have an impact on the price of a security when they cause an imbalance in the supply or demand for that security, thereby causing the price of that security to increase or decrease.

23.    Starting in approximately September 2016, the Defendants perpetrated a lucrative front-running scheme in the Williams Accounts by executing same day trades ahead of hundreds of large securities trades in the Funds Accounts.

24.    To obtain the lucrative and illicit profits, Billimek communicated to Williams that the Asset Manager planned to purchase or sell large quantities of a specific stock. Based on this material nonpublic information, Williams bought or sold the same stock in the Williams Accounts before the Asset Manager made the trade or during the time when tranches of large orders were being executed by the Asset Manager and before those orders impacted the market price of the specific stock. Then, shortly after the Asset Manager's trades were executed and the

price of the security reacted as expected, Williams closed out his just-established positions in the Williams Accounts, nearly always at a profit.

      A.    **Billimek Provided Williams with Material Nonpublic Information.**

    25.    Since at least August 2016, Williams and Billimek have communicated with each other using cell phones that are registered in their names with their mobile service providers.

    26.    Additionally, for at least the period of December 2020 through April 1, 2022, Williams, using a cell phone registered in his name, communicated frequently with a Boost Mobile pre-paid cell phone ("Pre-paid Phone 1" or "PP1") at or shortly before the time at which trades were placed in the Williams Accounts.

    27.    Between January 21, 2018 and May 26, 2021, a Google account associated with Billimek searched for Boost Mobile 22 times. In close proximity to some of those searches, the Google account searched for the zip code in Lenexa, Kansas, which is the city where the billing address for Pre-paid Phone 1 is located.

    28.    The account for Pre-paid Phone 1 was established by its user on or about August 30, 2016, shortly before the front-running scheme began.

    29.    Pre-paid Phone 1 was used principally to communicate with Williams. Between November 1, 2021 and April 1, 2022, Pre-paid Phone 1 sent 1,465 outgoing text messages, with 1,460 of those text messages (99.66%) going to Williams.

    30.    The last communication between Pre-paid Phone 1 and Williams occurred on Friday, April 1, 2022.

    31.    On March 22, 2022, Pre-paid Phone 1 exchanged four text messages with a different pre-paid cell phone ("Pre-paid Phone 2" or "PP2"). On April 1, 2022, Pre-paid Phone 1 exchanged five additional text messages with Pre-paid Phone 2.

32.     Starting on Monday, April 4, 2022, Pre-paid Phone 2 and Williams began communicating via text message. Williams continued to communicate via text messages with Pre-paid Phone 2 until August 19, 2022. Between April 4, 2022 and August 19, 2022, Williams communicated frequently with Pre-paid Phone 2 shortly before trades were placed in the Williams Accounts.

33.     During at least the period of October 18, 2022 through November 14, 2022, Pre-paid Phone 2 was regularly in approximately the same location as a mobile phone registered to Billimek.

34.     Pre-paid Phones 1 and 2 were used by Billimek to communicate with Williams to carry out a scheme in which Billimek repeatedly tipped Williams with material nonpublic information about the Fund Accounts' impending trades in violation of the duty that Billimek owed the Asset Manager.

**B.      Williams Traded on that Material Nonpublic Information.**

35.     Williams used two brokerage accounts over which he exercised control to place trades based on the material nonpublic information he received from Billimek. One of the Williams Accounts, which Williams opened in 2003, was held in Williams own name, while the other, which Williams opened in 2006, was held in the name of The Alan G Williams Income Trust, a trust for which Williams was both the beneficiary and trustee. The same Internet Protocol address used to regularly access the Williams Accounts was also used to access an email account in Williams' name. Furthermore, funds were transferred from the Williams Accounts to bank accounts in Williams' name.

36.     Williams traded in the Williams Accounts after receiving from Billimek the material nonpublic information about trades that would be placed by the Asset Manager on behalf of the Fund Accounts.

37.     Examples of the trading activity in the Williams Accounts are alleged in paragraphs 38 through 53 below:

### July 8, 2022 Trading in Company A

38.     Company A is a California-based beverage company whose common stock is listed on the Nasdaq Stock Market, LLC.

39.     On July 8, 2022, Williams front-ran the Fund Accounts' trading in the common stock of Company A multiple times in the same day in the following pattern: (i) Williams first communicated with Pre-paid Phone 2, (ii) Williams then purchased shares of Company A *before* (*i.e.,* in front of) the Fund Accounts purchased shares of Company A, (iii) Williams communicated again with Pre-paid Phone 2, and (iv) Williams locked in illicit profits by selling the Company A shares shortly after the Fund Accounts purchased the same shares:

| TIME (ET) | | EVENT |
|---|---|---|
| 9:58 AM – 9:59 AM | **Text** | Williams and PP2 exchanged texts |
| 10:00 AM – 10:32 AM | **Trade** | Williams bought 69,000 Company A shares |
| 10:19 AM – 10:33 AM | **Text** | Williams and PP2 exchanged texts |
| 10:35 AM – 10:43 AM | **Trade** | The Fund Accounts bought at least 64,343 Company A shares |
| 10:43 AM | **Text** | Williams and PP2 exchanged texts |
| 10:43 AM | **Trade** | Williams sold 69,000 Company A shares |

| TIME (ET) | | EVENT |
|---|---|---|
| 12:52 PM | **Text** | Williams and PP2 exchanged texts |
| 12:54 PM – 1:29 PM | **Trade** | Williams bought 57,000 Company A shares |
| 1:19 PM – 1:29 PM | **Text** | Williams and PP2 exchange texts |
| 1:29 PM – 1:32 PM | **Trade** | The Fund Accounts bought at least 70,838 Company A shares |
| 1:31 PM | **Text** | Williams texted PP2 |
| 1:32 PM | **Trade** | Williams sold 57,000 Company A shares |
| 1:33 PM – 1:35 PM | **Text** | Williams and PP2 exchanged texts |

| TIME (ET) | | EVENT |
|---|---|---|
| 2:14 PM | Text | Williams and PP2 exchanged texts |
| 2:16 PM – 3:34 PM | Trade | Williams bought 40,000 Company A shares |
| 3:16 PM – 3:36 PM | Text | Williams and PP2 exchanged texts |
| 3:36 PM – 3:40 PM | Trade | The Fund Accounts bought at least 78,402 Company A shares |
| 3:37 PM – 3:40 PM | Text | Williams and PP2 exchanged texts |
| 3:40 PM | Trade | Williams sold 40,000 Company A shares |

40.     As a result of Williams' July 8, 2022 trading in Company A's securities, he realized profits of approximately $169,900.

## February 4, 2022 Trading in Company B

41.     Company B is a Connecticut-based travel-related company whose common stock is listed on the Nasdaq Stock Market, LLC.

42.     On February 4, 2022, Williams front-ran the Fund Accounts' trading in the common stock of Company B twice in the same day in the following pattern: (i) Williams first communicated with Pre-paid Phone 1, (ii) Williams then purchased shares of Company B *before* (*i.e.,* in front of) the Fund Accounts purchased shares of Company B, (iii) Williams communicated again with Pre-paid Phone 1, and (iv) Williams locked in illicit profits by selling the Company B shares shortly after the Fund Accounts purchased the same shares:

| TIME (ET) | | EVENT |
|---|---|---|
| 12:15 PM – 12:16 PM | Text | Williams and PP1 exchanged texts |
| 12:16 PM | Trade | The Fund Accounts bought 2 Company B shares |
| 12:17 PM – 12:18 PM | Text | Williams and PP1 exchanged texts |
| 12:20 PM – 1:30 PM | Trade | Williams bought 4,613 Company B shares |
| 12:33 PM – 1:41 PM | Trade | The Fund Accounts bought at least 13,534 Company B shares |
| 1:38 PM – 1:39 PM | Text | Williams and PP1 exchanged texts |
| 1:40 PM – 1:41 PM | Trade | Williams sold 4,613 Company B shares |

| TIME (ET) | | EVENT |
|---|---|---|
| 1:41 PM | Text | Williams and PP1 exchanged texts |
| 2:12 PM – 2:49 PM | Trade | Williams bought 2,700 Company B shares |
| 2:55 PM – 2:57 PM | Text | Williams and PP1 exchanged texts |
| 2:57 PM – 2:58 PM | Trade | The Fund Accounts bought at least 9,488 Company B shares |
| 2:58 PM | Text | Williams texted PP1 |
| 2:58 PM | Trade | Williams sold 2,700 Company B shares |
| 2:59 PM | Text | Williams and PP1 exchanged texts |

43.     As a result of Williams' February 4, 2022 trading in Company B's securities, he realized profits of approximately $183,200.

**May 21, 2021 Trading in Company C**

44.     Company C is a California-based producer of technology platforms, whose common stock is listed on the New York Stock Exchange.

45.     On May 21, 2021, Williams front-ran the Fund Accounts' trading in the common stock of Company C in patterns similar to those alleged above with respect to Company A and Company B:

| TIME (Eastern Time) | | EVENT |
|---|---|---|
| 9:39 AM – 9:41 AM | Text | Williams and PP1 exchanged texts |
| 9:41 AM – 9:56 AM | Trade | Williams bought 11,000 Company C shares |
| 10:04 AM | Text | PP1 texted Williams |
| 10:04 AM - 10:06 AM | Trade | The Fund Accounts bought at least 14,191 Company C shares |
| 10:05 AM - 10:06 AM | Trade | Williams sold 11,000 Company C shares |

| TIME (Eastern Time) | | EVENT |
|---|---|---|
| 10:15 AM | Text | PP1 texted Williams |
| 10:15 AM | Trade | Williams bought 2,000 Company C shares |
| 10:16 AM – 10:19 AM | Text | Williams and PP1 exchanged texts |
| 10:20 AM – 11:05 AM | Trade | Williams bought 35,000 Company C shares |
| 11:06 AM – 11:09 AM | Text | Williams and PP1 exchanged texts |
| 10:15 AM – 11:09 AM | Trade | The Fund Accounts bought at least 69,756 Company C shares |
| 11:09 AM | Trade | Williams sold 37,000 Company C shares |

| TIME (Eastern Time) | | EVENT |
|---|---|---|
| 12:24 PM – 12:27 PM | Text | Williams and PP1 exchanged texts |
| 12:28 PM – 12:49 PM | Trade | Williams bought 13,000 Company C shares |
| 12:50 PM – 12:54 PM | Text | Williams and PP1 exchanged texts |
| 12:54 PM – 12:58 PM | Trade | The Fund Accounts bought at least 13,493 Company C shares |
| 12:55 PM | Text | Williams texted PP1 |
| 12:58 PM | Trade | Williams sold 13,000 Company C shares |

46.     As a result of Williams' May 21, 2021 trading in Company C's securities, he realized profits of approximately $154,174.

### April 2, 2020 Trading in Company D

47.     Company D is a Canadian-based apparel company, whose common stock is listed on the Nasdaq Global Select Market.

48.     On April 2, 2020, Williams front-ran the Fund Accounts' trading in the common stock of Company D by purchasing Company D shares before the Fund Accounts purchased Company D shares, and then selling those shares shortly after the Fund Accounts purchased Company D shares:

| TIME (ET) | TRADES |
|---|---|
| 10:58 AM – 11:28 AM | Williams bought 20,000 Company D shares |
| 10:54 AM – 11:35 AM | The Fund Accounts bought at least 48,024 Company D shares |
| 11:35 AM | Williams sold 20,000 Company D shares |
| 12:15 PM – 12:50 PM | Williams bought 20,000 Company D shares |
| 12:24 PM – 12:54 PM | The Fund Accounts bought at least 20,243 Company D shares |
| 12:53 PM – 12:54 PM | Williams sold 20,000 Company D shares |

49.     As a result of Williams' April 2, 2020 trading in Company D's securities, he realized profits of approximately $48,600.

### October 25, 2016 Trading in Company E

50.     Company E is a China-based technology company whose common stock is listed on the Nasdaq Global Services.

51.     On October 25, 2016, Williams front-ran the Fund Accounts' trading in the common stock of Company E by selling short Company E shares before the Fund Accounts sold Company E shares and then purchasing Company E shares to cover the short position shortly after the Fund Accounts purchased Company E shares.

| TIME (ET) | TRADES |
|---|---|
| 10:21 AM – 10:27 AM | Williams sold short 15,000 Company E shares |
| 10:31 AM – 10:33 AM | The Fund Accounts sold at least 18,477 Company E shares |
| 10:32 AM – 10:33 AM | Williams bought 15,000 Company E shares to cover his short position |
| 11:56 AM – 12:23 PM | Williams sold short 17,000 Company E shares |
| 12:24 PM – 12:25 PM | The Fund Accounts sold at least 48,012 Company E shares |
| 12:25 PM – 12:27 PM | Williams bought 17,000 Company E shares to cover the short position |

52.     As a result of Williams' October 25, 2016 trading in the securities of Company E, he realized profits of approximately $18,200.

53.     From at least September 2016 through at least August 15, 2022, Williams traded in this manner, front-running trading in the Fund Accounts in the securities of hundreds of public companies.

        C.      **Trading Success and Profits**

54.     The Williams Accounts were extraordinarily successful when trading in the same securities, and on the same days, as the Funds Accounts. That success is neither an accident nor random, but instead is the result of the Defendants improperly using the Asset Manager's material nonpublic information for their benefit.

55.     A trader's "dollar-weighted win rate" is the proportion of the trader's investment dollars associated with profitable outcomes.  For example, if a trader invested $1 million, and $900,000 of the investments were associated with profitable outcomes, the dollar-weighted win rate would be 90%.

56.    Prior to September 2016, when the scheme began, the Williams Accounts' dollar-weighted win rate fluctuated from month-to-month from less than 20% to over 70%.

57.    Starting in September 2016, the Williams Accounts' dollar-weighted win-rate increased dramatically, and remained mostly above 90% for all months thereafter, as demonstrated below.



58.    The Williams Accounts placed intraday roundtrip stock trades as part of the scheme alleged in this Complaint, which entails opening a stock position (through either a purchase or short sale) during the trading day and closing that position in the same trading day.

59.    During the period of September 2016 through August 15, 2022, the Williams Accounts initiated intraday roundtrip stock trades in 1,697 unique combinations where: (i) the Fund Accounts traded in the same symbol on the same date and in the same direction and (ii) where the Williams Accounts opened their position prior to and closed their position after trades in the Funds Accounts.

60.    The Williams Accounts opened their position before large trades made by the Fund Accounts occurred, and the Williams Accounts closed their position after large trades made by the Funds Accounts had a chance to impact the market.

61.    When the Fund Accounts traded and the Williams Accounts opened an intraday roundtrip trade in the same security, the opening trade in the Williams Accounts was highly correlated with the direction of Fund Accounts' trades. The odds that the significant overlap of trading in the Williams Accounts with trading by the Fund Accounts occurred by random chance is less than one-in-a-trillion.

62.    Williams made profits of at least $47.3 million from his trades that correlated with the Fund Accounts' trades.

63.    The Defendants intended for the Williams Accounts to benefit from the short-term market impact of large orders executed in the Fund Accounts. The correlation between the Williams Accounts trading and trading of the Funds Accounts supports this intent, as does the Williams Accounts' win rate (97%) and profits ($47.3 million) on trades that overlapped with the Funds Accounts.

**IV.    Money Transfers**

64.    Since September 2016, more than $34 million has been transferred from the Williams Accounts to U.S.-based bank accounts in Williams' name.

65.    Between September 2016 and April 2017, Williams transferred at least $540,000 to a bank account owned by Billimek.

**V.    The Defendants Acted Knowingly, Recklessly, and their Conduct was Negligent.**

66.    Billimek knew, consciously avoided knowing, or was reckless in not knowing that the information he tipped was material and nonpublic and that he was breaching his duty to the

15

Asset Manager by disclosing material nonpublic information to Williams. Billimek also knew, consciously avoided knowing, or was reckless in not knowing that the information he communicated to Williams would be used for trading.

67.    Billimek received a personal benefit from his tips of material nonpublic information to Williams, including payments of at least $540,000 from Williams.

68.    Williams front-ran the Fund Accounts' trading in numerous securities based on material nonpublic information that he received from Billimek that Williams knew, consciously avoided knowing, or was reckless in not knowing that Billimek disclosed to him in breach of a duty of trust and confidence for a personal benefit.

69.    Williams knew, consciously avoided knowing, or was reckless in not knowing that the information was material and nonpublic.

70.    In addition, for purposes of claims alleged herein that can be satisfied with a showing that their conduct was negligent, Billimek's and Williams's conduct was also negligent because they failed to exercise ordinary or reasonable care when engaging in deceptive conduct. No reasonable person would have repeatedly provided or received and traded on the information about trades that would be placed on behalf of the Fund Accounts in the manner described above.

### FIRST CLAIM FOR RELIEF
**Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and (c) Thereunder**
**(Against both Defendants)**

71.    The SEC realleges and incorporates by reference each and every allegation in paragraphs 1 through 70, as though fully set forth herein.

72.    By virtue of the foregoing, Defendants, singly or in concert with others, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of

interstate commerce, or of the mails, or a facility of a national securities exchange, directly or

indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of

material fact or omitted to state material facts necessary in order to make the statements made, in

the light of the circumstances under which they were made, not misleading; or (c) engaged in

acts, practices, or courses of business which operated or would have operated as a fraud or deceit

upon persons. By virtue of the foregoing, Defendants, directly or indirectly, violated, and unless

enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule

10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**
**Violations of Securities Act Sections 17(a)**
**(Against both Defendants)**

73.    The SEC realleges and incorporates by reference each and every allegation in

paragraphs 1 through 70, as though fully set forth herein.

74.    By virtue of the foregoing, Defendants, singly or in concert with others, in

connection with the offer or sale of securities, by the use of the means or instrumentalities of

interstate commerce, or of the mails, or a facility of a national securities exchange, directly or

indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of

material fact or omitted to state material facts necessary in order to make the statements made, in

the light of the circumstances under which they were made, not misleading; or (c) engaged in

acts, practices, or courses of business which operated or would have operated as a fraud or deceit

upon persons. By virtue of the foregoing, Defendants, directly or indirectly, violated, and unless

enjoined, will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a))].

## THIRD CLAIM FOR RELIEF
### Violations of Investment Company Act Section 17(j) and Rule 17j-1(b)(1) and (3)
### (Against Billimek)

75.     The SEC realleges and incorporates by reference each and every allegation in paragraphs 1 through 70, as though fully set forth herein.

76.     By engaging in the conduct described above, Billimek, an affiliated person of an investment adviser, that is, the Asset Manager, of certain registered investment companies, in connection with the purchase or sale, directly and indirectly, of a security held or to be acquired by registered investment companies advised by those registered investment companies, has: (a) employed devices, schemes and artifices to defraud those registered investment companies; and (b) engaged in acts, practices or courses of business that operates or would operate as a fraud and deceit on those registered investment companies.

77.     By reason of the foregoing acts and practices, Billimek violated and, unless enjoined, will continue to violate Section 17(j) of the Investment Company Act [15 U.S.C. § 80a-17] and Rule 17j-1(b)(1) and (3) [17 C.F.R. § 270.17j-1(b)(1) and (3)] thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the SEC requests that the Court:

### I.

Find the Defendants violated the securities laws and rules promulgated thereunder as alleged against them;

### II.

Enter an injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendants from violating the laws and rules they are alleged to have violated;

**III.**

Order Defendants and Relief Defendants to disgorge all of the ill-gotten gains from the violations alleged in this Complaint, and order them to pay prejudgment interest thereon;

**IV.**

Order Defendants to pay civil money penalties pursuant to Exchange Act Section 21A [15 U.S.C § 78u-1], or Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Securities Act Section 20(d) [15 U.S.C. § 77t(d)], and Investment Company Act Section 49 [15 U.S.C. § 80a-48] and;

**V.**

Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

**V.**

Grant any other and further relief as the Court deems just and proper.

**<u>DEMAND FOR A JURY TRIAL</u>**

The SEC demands a trial by jury on all claims so triable.

Dated: December 14, 2022

Respectfully submitted,

Gregory A. Kasper (NY 2735405; SDNY GK6596)
Terry R. Miller (*pro hac vice* application forthcoming)
SECURITIES AND EXCHANGE COMMISSION
Denver Regional Office
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000
kasperg@sec.gov
millerte@sec.gov